**ADVANCED OFFICE SYSTEMS, INC., Plaintiff,**

v.

**ACCOUNTING SYSTEMS COMPANY, INC., Defendant.**

**Civ. A. No. 77–2106.**

District Court, D. South Carolina, Greenville Division.

Dec. 15, 1977.

---

George F. Townes, Greenville, S. C., for plaintiff.

D. Allen Grumbine of Wyche, Burgess, Freeman & Parham, P. A., Greenville, S. C. and Alston, Miller & Gaines, Atlanta, Ga., for defendant.

## ORDER ON DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AGAINST DEFENDANT UPON WHICH RELIEF CAN BE GRANTED [1]

HEMPHILL, District Judge.

Defendant's motion to dismiss the complaint for failure to state a claim upon which relief can be granted, filed November 11, 1977, attacks the complaint, filed October 21, 1977, and its supporting exhibit. After hearing oral arguments thereon on November 16, 1977, plaintiff requested time to submit an additional brief, which was granted. The court has now reviewed plaintiff's and defendant's memoranda of law, together with the memorandum filed in opposition to plaintiff's motion for a preliminary injunction and certain supporting affidavits. For the reasons stated herein, the motion to dismiss is granted.

In this case plaintiff seeks a preliminary injunction and damages, claiming defendant has engaged in price discrimination activities which are prohibited by Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a) [2]. Plaintiff alleges that defendant unlawfully discriminates in price between certain customers and transactions which involve the printing of billing statements from films sent to defendant by its dealers, and the mailing of those statements to clients of the billing service customers.[3] For the purposes of this consideration, the allegations of the Complaint are accepted as true. Defendant's motion is based upon the insistence that the alleged discriminatory transactions do not involve sales of "commodities" within the meaning of the Robinson-Patman Act, and therefore the Complaint fails to state a claim cognizable under attack.

From the affidavits [4] presented to the court, and from statements made by coun-

---

1. Fed.R.Civ.P. 12(b)(6).

2. Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, provides in pertinent part as follows:

   (a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, *to discriminate in price between different purchasers of commodities of like grade and quality,* where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: Provided, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered . . . 15 U.S.C. § 13(a) (1970) (emphasis supplied).

3. Paragraph 4 of the Complaint states:

   The defendant's sale of prepared billings of accounts receivable is performed generally in the manner alleged below. An agent of the defendant goes to the customer's place of business and photographs the customer's accounts receivable ledger cards. The exposed film is then sent by the defendant's agent to the defendant's place of business in Georgia. There, utilizing the photographed copies of the customer's account cards, the defendant prints statements, puts them in envelopes, and mails them to the customer's debtors. In addition, for extra charge and at the customer's request, the defendant will include in the envelopes to designated debtors form letters known as "collection letters", prepared and printed by the defendant.

4. Affidavits of Al Metcalf, defendant's representative in the upper part of South Carolina, and Walter V. Graves, president of defendant, are part of the record in the case, having been filed November 15, 1977.

sel and not at issue, are revealed the following

### FACTS

On October 7, 1970, Gene Bishop executed a regional dealer agreement with the defendant making him its representative in upstate South Carolina. The agreement was subsequently amended and, effective June 1, 1977, was terminated by defendant because of Gene Bishop's admitted violations. Under the terms of the agreement Gene Bishop is prohibited from competing with defendant for the one-year period after its termination, June 1, 1977 to May 31, 1978. Defendant commenced an action in the Court of Common Pleas for Spartanburg County, South Carolina on or about June 16, 1977 seeking to enjoin Gene Bishop from competing with it during the one-year period, and on July 6, 1977 the court temporarily enjoined Gene Bishop from entering into such competition.

On or about June 20, 1977, approximately four days after defendant commenced the above-mentioned action, Gene Bishop's wife, Connie Bishop, filed Articles of Incorporation for Connie's Advanced Systems, Inc., a company designed to enter into the business that Gene Bishop was enjoined from continuing. Connie Bishop later, by Articles of Amendment filed with the Secretary of State of South Carolina, changed the name of such corporation to Advanced Office Systems, Inc., the plaintiff in this action. Connie Bishop is the sole stockholder of the plaintiff corporation and it is understood that Gene and Connie Bishop are the corporation's sole employees. Connie Bishop's company, the plaintiff in this action, is now competing with defendant and its representatives in the ten county upstate South Carolina area and is attempting to keep all of Gene Bishop's former customers.

On or about June 13, 1977, Al Metcalf, representative for defendant in the Louisville, Kentucky area, moved to Spartanburg, South Carolina to represent defendant in the upstate South Carolina area. Since moving to South Carolina, Al Metcalf has sought to establish himself as a dealer in billing services. The service provided by Al Metcalf on defendant's behalf is essentially as described in plaintiff's Complaint, i. e., Metcalf calls on a customer, microfilms the customer's billing records, sends the film to defendant for developing, and defendant processes the film and produces photocopy prints of the bills which it mails for the customer. Defendant suggests a price charge per billing statement for this service but defendant's representatives selects the actual price charged the customer. Defendant's representative is paid a commission per billing statement based on the suggested price and any amount charged by the representative in excess of such price is paid penny for penny to the representative and any amount charged by the representative less than such price is subtracted penny for penny from such representative's commission.

The suggested price pertinent in this action varies from $.16 to $.18 depending on the number of statements sent and defendant's representative's commission varies from 30% to 40% of such suggested price depending on whether the representative uses his own camera to film the records and depending on the number of statements he produces. In a typical situation a representative who charges the suggested price of $.16 per statement and who earns a 40% commission, receives a 6.4 cent commission. If the representative charges the customer $.18 per statement, he gets the extra 2 cents per statement ($.18 – $.16) and earns 8.4 cents per statement commission (6.4 cents + 2 cents). If the representative charges the customer $.12 per statement, as Al Metcalf does, he loses 4 cents per statement commission, and earns 2.4 cents per statement commission (6.4 cents – 4 cents).

While Al Metcalf was defendant's representative in the Louisville, Kentucky area he charged his customers $.13 per statement and upon moving to South Carolina chose to charge his customers $.12 per statement. Such decision was solely Al Metcalf's and each penny per statement below the suggested price which he charges comes out of

his pocket and no part of such lower price is absorbed by defendant.

Shortly after moving to South Carolina Al Metcalf decided to send a mailing to potential customers in the region offering billing services at $.12 per statement. He lacked the secretarial help necessary to type and distribute such a mailing and contacted defendant and requested that it type and mail out the letter for him. Defendant did type and mail out this letter solely at the request of and solely on behalf of Al Metcalf. Attached to the Complaint, as Exhibit "E", is the letter referred to in the foregoing paragraph which is designated as a *Special Notice* on the stationary of Accounting Systems Company, Inc., Fayetteville, Georgia, 30214, and which contains the following language:

> We wish to offer you a substantial savings on our "Micro-Statement Billing Service". Gene Bishop had been charging you $.20 per statement which greatly exceeds our suggested list of $.16 to $.18 depending on the quantity of statements you send.
>
> Because of the confusion and any inconvenience that you may have incurred and in order to assist our valued customers, we wish to offer the service to you below our suggested list price. Therefore we propose to continue our service to you at the greatly reduced rate of $.12 per statement for a period of one year.

Exhibit "B", page 2, attached to the plaintiff's Complaint is a letter of July 12, 1977 from Walter V. Graves, President of defendant to Rex H. Dillingham, M.D. (with copy to Metcalf) the last two paragraphs read:

> Judge Wade S. Weatherford, Jr., in Spartanburg, has ordered Gene Bishop to abide by his agreement and not to contact, solicit or service ASC clients or to aid anyone else in doing the same.
>
> We feel that in order to service you better we still need local representation. To that extent, Mr. Al Metcalf and Cindy Wilson have been transferred to South Carolina to represent ASC and to help you with your system needs. He will be contacting you to introduce Cindy and himself. Through these two well qualified representatives, ASC respectively request the opportunity of providing your office with quality products, superior service and competitive prices.

## CONCLUSIONS OF LAW

The Complaint fails to state a claim upon which relief can be granted because defendant's business is the providing of a service to its customers, rather than the selling of goods or commodities, and the transactions alleged are not within the scope of 15 U.S.C. § 13. Courts have uniformly held that the term "commodities" as used in the Robinson-Patman Act (forbidding price discrimination "between different purchasers of commodities of like grade and quality") is restricted to products, merchandise, or other tangible goods and does not apply to services. *Baum v. Investors Diversified Services, Inc.*, 409 F.2d 872 (7th Cir. 1969).[5]

5. *Baum*, a case pitched under the same statute used here as a vehicle for suit, ruled in part:

The word "commodity" is defined in two ways: (1) something of use, advantage or value, and (2) an article of trade or commerce, especially a product distinguished from a service. Random House Dictionary of the English language, 296. We think that Congress intended to limit the scope of the Act to the second definition of commodity, namely, a product as distinguished from a service.

Representative Patman explained the Act in these terms, which clearly emphasize the Act's application to tangible products:

* * * this bill insures to the independent dealer who buys one carload, whether of groceries, dry goods, hardware or any other commodity, the same price that is given to the chain buying 10 carloads of the same goods, unless that chain can show a concrete savings in cost resulting from its method of purchase and delivery, * * * 79 Cong.Rec. 9079, June 11, 1935. Moreover, an application of the Act to mutual fund shares would render absurd its requirement in Sec. 2(a) that the commodities be of "like grade and quality," and its proviso in that section to allow prices to reflect "differences in the cost of manufacture, sale or delivery" and its proviso exempting price changes reflecting the "marketability of the good concerned. * * *". See Rowe, Price Discrimination under the Robinson-Patman Act, 59–62 (1962).

See *TV Signal Co. of Aberdeen v. American Tel. & Tel. Co.*, 462 F.2d 1256 (8th Cir. 1972); *Export Liquor Sales, Inc. v. Ammex Warehouse Co.*, 426 F.2d 251 (6th Cir. 1970), *cert. denied*, 400 U.S. 1000, 91 S.Ct. 460, 27 L.Ed.2d 451 (1971); *Tri-State Broadcasting Co., Inc. v. United Press International, Inc.*, 369 F.2d 268 (5th Cir. 1966); *Ideal Plumbing Co. v. Benco, Inc.*, 382 F.Supp. 1161 (W.D.Ark.1974); *Lang's Bowlarama, Inc. v. AMF, Inc.*, 1974–2 Trade Cases ¶ 75,158 (D.R.I.1974); *Gordon v. New York Stock Exch. Inc.*, 366 F.Supp. 1261 (S.D.N.Y.1973), *aff'd*, 498 F.2d 1303 (2nd Cir. 1974), *aff'd* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *Rea v. Ford Motor Co.*, 355 F.Supp. 842 (W.D.Pa.1973), *rev'd on other grounds*, 497 F.2d 577 (3d Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); *Plum Tree, Inc. v. N.K. Winston Corp.*, 351 F.Supp. 80 (S.D.N.Y.1972); *Bichel Optical Labs., Inc. v. Marquette National Bank*, 336 F.Supp. 1368 (D.Minn.1971); *Record Club of America, Inc. v. Columbia Broadcasting Sys., Inc.*, 310 F.Supp. 1241 (E.D.Pa.1970); *LaSalle St. Press, Inc. v. McCormick & Henderson, Inc.*, 293 F.Supp. 1004 (N.D.Ill. 1968), *aff'd on other grounds*, 445 F.2d 84 (7th Cir. 1971); *Gaylord Shops, Inc. v. Pittsburgh Miracle Mile Town & Country Shopping Center, Inc.*, 219 F.Supp. 400 (W.D.Pa. 1963). *Cf., United States v. United Shoe Machine Co.*, 264 F. 138, 165 (E.D.Mo.1920), *aff'd* 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922) (similar language of original Section 2 of Clayton Act, 38 Stat. 730 (1914), did not apply to leases of machinery); *Fleetway, Inc. v. Public Service Interstate Transp.*

*Co.*, 72 F.2d 761 (3d Cir. 1934), *cert. denied*, 293 U.S. 626, 55 S.Ct. 347, 79 L.Ed. 713 (1935) (similar language of original Clayton Act not applicable to service of providing bus transportation).

The courts have consistently held that the transfer of an intangible, such as the services provided by the defendant, is not within the scope of the Robinson-Patman Act, even though the sale involves the incidental transfer of a tangible item, such as the billing statements themselves. In *Freeman v. Chicago Title & Trust Co.*, 505 F.2d 527 (7th Cir. 1974), the court said in reference to Section 2 (15 U.S.C. § 13):

> The transfer of any intangible can rarely be accomplished without the "incidental involvement" of documents or other tangibles; consequently, it is the "dominant nature" of such transactions which determines whether they are subject to § 2(c).

CT&T does provide purchasers of title insurance with a tangible, physical document. More importantly, however, it provides them with a professional service, namely, the search of records which might reveal a defect in the title and the rendering of an opinion based upon this search; the reports, like legal memoranda, are merely the embodiment of that service. Clearly, it is the performance of this service and not the delivery of a physical document which constitutes the dominant nature of the transaction between CT&T and its customers. . . .

505 F.2d at 531 (footnote omitted).

We think, moreover, that the word "commodity" has the same meaning in both Sec. 2(a) and Sec. 3 of the Act. Section 3 of the Clayton Act, 15 U.S.C. § 14, renders illegal certain tying clauses in leases or sales of "goods, wares, merchandise, machinery, supplies, or other commodities * * *. Under the principle of *ejusdem generis* the word "commodities" is restricted to the same class of articles previously enumerated, all of which are tangible products.

This court has indicated that the word "commodity" as used in the Clayton Act is restricted to products, merchandise or other tangible goods. In *Columbia Broadcasting System, Inc. v. Amana Refrigeration, Inc.*, 295 F.2d 375 (7th Cir. 1961), *cert. denied*, 369 U.S. 812, 82 S.Ct.

689, 7 L.Ed.2d 612 (1962), this court held that the word "commodity" as used in both Sections 2(a) and 3 of the Clayton Act did not include a contract right for television sponsorship. Judge Castle, speaking for a panel of this court, stated:

[W]e are of the opinion that the most reliable guide to the meaning of the word "commodity" is the context in which it is employed and in our considered judgment the context here—goods, wares, merchandise, machinery and supplies—does not permit an application of the term which embraces the contractual right or privilege of sponsorship identification with the broadcast of a television program * * *. *Id.* at 378.

In *Tri-State Broadcasting Co., Inc. v. United Press International Inc.*, 369 F.2d 268 (5th Cir. 1966), the court said:

> Virtually no transfer of an intangible in the nature of a service, right, or privilege can be accomplished without the incidental involvement of tangibles, and we conclude that in such circumstances the dominant nature of the transaction must control in determining whether it falls within the provisions of the Act. . . . 369 F.2d at 270.

*Accord, General Shale Prods. Corp. v. Struck Constr. Co.*, 132 F.2d 425 (6th Cir. 1942), *cert. denied*, 318 U.S. 780, 63 S.Ct. 857, 87 L.Ed. 1148 (1943) (construction of a housing project, even though bricks are used); *Kennedy Theater Ticket Serv. v. Ticketron, Inc.*, 342 F.Supp. 922 (E.D.Pa. 1972) (right to seat in theater, even though the theater ticket tangible); *Lubbock Glass & Mirror Co. v. Pittsburgh Plate Glass Co.*, 313 F.Supp. 1184 (N.D.Tex.1970) (glazing contract, even though glass, doors, windows and frames supplied); *Sano Petroleum Corp. v. American Oil Co.*, 187 F.Supp. 345, 357 (E.D.N.Y.1960) (lease of trucks, even though gasoline for them supplied).

Plaintiff concedes that services and intangibles are exempt from the Act, but argues that the offerings and billings of defendant are not services or intangibles. Plaintiff would have the court compare defendant's activities to such things as T-shirts, sports trophies, match books, silver napkin rings, suits of clothes, paper and envelopes for sale.[6] The comparisons are not sufficient as far as the dominant nature of the activities of defendant so as to bring them within the definition of a commodity.

Plaintiff's comparison to the above-mentioned "commodities" is misplaced. It argues that these as well as the billings and offerings are specially manufactured products, designed to suit peculiar individual needs, and as such the physical, tangible nature of the products controls the nature of these products and establishes them as commodities.

The plaintiff fails in his analogies, for the issue to be addressed is not the process by which it is made or the "customized" nature of the item, but rather what its dominant function is. A specially manufactured T-shirt which is customized and which serves an advertising purpose still has as its dominant function the covering of a body. It has functional value solely derived from its tangible existence. A sports trophy symbolizes accomplishment in athletic endeavors. Its function is to boost the human spirit and/or induce nostalgia. A matchbook, although specially manufactured, has as its outstanding feature the content of matches, a tangibly functional product. The bills used in a billing service have no self-contained function. They are useless unless sent to an account debtor, but once sent they effectuate many collections. Such is the dominant function of the bills and billing service—by effectuating collection, the defendants render a service.

Unfortunately for his purposes, plaintiff can cite no case upon which this court can base the judgment that the services rendered here by the defendant constituted commodities. Attached to the plaintiff's memorandum is a thermofax of *Kennedy Theater Ticket Service, et al. v. Ticketron, Inc.*, supra. This court feels that the case supports defendant's position here, because of the comparison. The case involved a question of whether an admission ticket constitutes a tangible product and what could be classified as a commodity.[7] We quote from that case:

> Plaintiff argues that the admission ticket itself constitutes a tangible product within the purview of the Act. As we have previously mentioned, a ticket is a memorandum of an agreement creating a revocable license to a particular seat at a particular time. When confronted with

---

**6.** All of these are exposed in plaintiff's memorandum of law in opposition to defendant's motion to dismiss (filed November 23, 1977).

**7.** Reference is invited to footnote 4 of this opinion wherein a Pennsylvania judge lists a number of cases in which the word "commodity" as used in the Clayton Act, has been interpreted and defined.

an item with both tangible and intangible aspects, the Court in *Tri-State Broadcasting Co. v. U. P. I.*, 369 F.2d 268 (5th Cir. 1966), established the following test:

"Virtually no transfer of an intangible in the nature of a service, right, or privilege can be accomplished without the incidental involvement of tangibles, and we conclude that in such circumstances the dominant nature of the transaction must control in determining whether it falls within the provisions of the Act." 369 F.2d at 270.

See also *LaSalle Street Press, Inc. v. McCormick and Henderson, Inc.*, supra, 293 F.Supp. at 1005; *Gaylord Shops, Inc. v. Pittsburgh Miracle Mile Town and Country Shopping Center, Inc.*, 219 F.Supp. 400 (W.D.Pa.1963). In the instant case, the dominant purpose of the transaction is not merely the purchase of the tangible admission ticket, but rather the contractual right to occupy a seat at an entertainment attraction. The ticket itself is merely incidental to the transaction, representing a tangible memorandum of the contract. We, therefore, conclude that since the intangible aspects of the admission tickets are dominant over the tangible aspects thereof, an admission ticket does not constitute a "commodity" within the meaning of the Act.

Plaintiff argues that the primary concern of Congress in the enactment of 15 U.S.C. § 13 was for the promotion of competition in the resale market, and the Act specifically applies to commodities for resale. By this rationale, plaintiff seeks to distinguish the cases cited heretofore and argues further that since the tickets were bought for resale, they lie within the ambit of the Act. Plaintiff's argument begs the question presented in this motion, for before we can determine whether there is a discrimination in sales of commodities for resale, we must determine whether there is a commodity. Since we have found that an admission ticket does not constitute a commodity within the meaning of the Act, we find no merit in plaintiff's argument.

Comparison is in order. Preparation and preparing and printing accounts receivable billing is a service, or is so incidental to a service to be a part of that service. Defendant is not selling a commodity. Defendant is selling a service, and such service is not a commodity within the meaning of the Robinson-Patman Act. In the absence of a sale of "commodities", no cause of action will lie under the Robinson-Patman Act.

The motion to dismiss is granted and the Clerk will enter an Order dismissing the Complaint.

AND IT IS SO ORDERED.